Wilkins, Douglas H., J.
The plaintiff in this motor vehicle accident case, Jolie Wu (“Wu”) has filed the “Plaintiffs Motion for Time Limited (1 Hour Each) Attorney Conducted Voir Dire” (“Motion”). Despite its *321 title, the Motion also addresses other aspects of the voir dire process, including a proposed jury questionnaire. The defendant, Anne S. Lauriat (“Lauriat’j has opposed the proposal for attorney-conducted voir dire, but does not appear to oppose the concept of a jury questionnaire or the questions proposed by Wu for live voir dire.
1. Supplemental Juror Questionnaire
By filling out a supplemental juror questionnaire, jurors provisionally seated in the juiy box can provide useful information during what would otherwise be down time while they wait for the selection process to conclude. The Court therefore plans to use a case specific juror questionnaire and to incorporate most of the questions proposed by the plaintiff. The defendant has not proposed additional questions, but may do so no later than the final trial conference on September 4, 2012. At that time, the questionnaire must be finalized to avoid delay on the day of the trial.
To save time, the Court will deploy the questionnaire in the following manner. The Court Officer will give a copy of the questionnaire to each juror at the time he or she is first directed to enter the juiy box. The first 14 qualified prospective jurors will fill out the questionnaire while they wait for the Court to fill in the first 14 seats and to qualify 8 potential replacement jurors (the maximum that the configuration of the Courtroom will allow).[1] Once those 22 jurors are in the juiy box or in nearby seats, the Court Officer will collect the completed questionnaires from the first 14 panel members and allow counsel to review them. The 8 replacement jurors will continue to fill out their questionnaires while the attorneys consider and exercise their initial peremptoiy challenges to the 14 panel members in the box. As replacements enter the juiy box to take the place of challenged jurors, they will provide their completed juiy questionnaire to the Court Officer. If additional replacement jurors are needed, they will answer the questionnaires either in writing or at side bar, depending upon which appears most efficient at the time.
The Court anticipates that proceeding in this manner will take only a little extra time and will provide useful information to each side in exercising peremptoiy challenges. Taking that slight additional time is worthwhile to identify potentially biased attitudes and to allow exercise of peremptories based upon something more than stereotypes.
2. Attorney-Led Voir Dire
The question of attorney voir dire is more challenging and controversial. There is, however, no question that the Court has authority to allow it.
Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath, a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice therein . . .
For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including but not limited to, community attitudes . . . [and] preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall, or the parties may, with the permission and under the direction of the court, examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case.
G.L.c. 234, §28 (emphasis added). Typically in Massachusetts, however, the Judge conducts voir dire, not the attorneys. See Toney v. Zaryoff's, Inc., 52 Mass.App.Ct. 554, 557 (2001); Commonwealth v. Burden, 15 Mass.App.Ct. 666, 674 (1983); Julia Mirabella & Geoffrey J. Derrick, “Voir Dire In Massachusetts State And Federal Courts: Commentary And Suggestions For Revision,”[2] p. 30 (January 20, 2012) (“Mirabella”).
The plaintiff alleges that there is a widespread and deeply held bias toward plaintiffs in personal injury cases and that attorney-conducted voir dire is the best way to eliminate juror bias. In part, this rests upon the assertion (with anecdotal support) that the public is subject to “a constant barrage of news and information” that “unmeritorious lawsuits are contributing to the country’s economic problems.” Motion at 4. Wu cites Principle 11.B.2 of the American Bar Associations’ “Principles for Juries and Jury Trials,” which states, in part:
Following initial questioning by the court, each party should have the opportunity, under the supervision of the court and subject to reasonable time limits, to question jurors directly, both individually and as a panel.
Most states allow some form of attorney involvement in voir dire, and it is not clear that Massachusetts has the best approach.[3] Wu also cites research suggesting that jurors will answer less-frankly to a judge’s questions than to an attorney’s questions because of the judge’s authority and the unwillingness to admit bias to an authority figure.[4] Implicit in her argument is the notion that this case, though apparently similar to many other motor vehicle cases on liability, includes claims for damages for an alleged permanent brain injuiy that might suffer from the type of juror bias she fears.
The defendant responds that the Motion “rests on the unproven assumption that prospective jurors are *322 more likely to be biased against plaintiffs than defendants.” Sylva v. Anthony, 14 Mass. L. Rptr 337, 2002 WL 202467 (2002) (Gants, J.). In Sylva, Justice Gants reviewed the evidence regarding the success of plaintiffs in certain Massachusetts counties compared to that in other states. For some updated statistics and viewpoints on plaintiffs’ success rates in Massachusetts, see David A. Frank, “Odds Against Tort Plaintiffs in Massachusetts,” Massachusetts Lawyers Weekly (June 14, 2010).[5] Justice Gants concluded that “(t]here is nothing to demonstrate that the relatively low success rate of plaintiffs in Massachusetts can be significantly attributed to the absence of attorney voir dire rather than to a host of other possible variables. ” Id. Citing a recent case in which the plaintiff and defendant took the opposite position of their counterparts here, Lauriat argues that limited court-led voir dire would be more beneficial to the plaintiff than the process set forth in her Motion. Actually, that observation tends to support the fairness of the Motion, as the Court would quickly reject any method that favored one side over the other.
The standard practice of this Court and numerous other judges to conduct individual voir dire in nearly all cases, with opportunity for attorney follow up questions directly to jurors, addresses some of the plaintiffs’ concerns. See “Individual Voir Dire and Fair Juries, Treatment of Jurors,” Hon. Raymond J. Brassard, Mass. Lawyers Weekly, 32 M.L.W. 1224 (February 9, 2004). For instance, the Court routinely emphasizes to jurors at side bar that they should not say what they think the judge wants to hear; that only they can answer for themselves whether they can be truly honest; and that the Court really wants to know if, after consulting his or her conscience, the juror feels able to be completely fair to both sides. The Court is convinced that its standard practice is a good means to minimize the risk of juror bias. There is no way to be sure, though, particularly where attorney-conducted voir dire occurs so rarely in Massachusetts.
The Motion does not turn, however, on whether the Court agrees or disagrees with the plaintiffs assessment of court-conducted voir dire. The plaintiff has presented some support in the literature, anecdotal experience and ABA standards for her perception that judge-only voir dire is not the best way to eliminate juror bias. See Mirabella at 30 (“A strong case may be made for the need for increased lawyer participation in judge voir dire, which stems from the benefits of the adversarial system upon which our judiciary relies in other contexts”). Even if one does not share the perception of bias, the perception exists, and there is no clear evidence to disprove it. In our justice system, the perception of fairness counts for a lot.
While judge-conducted voir dire has the advantage of impartiality and strict control over potentially improper influences upon the jury, attorney voir dire may also have complementary advantages. The plaintiff may be right that jurors will be more forthright in signaling possible bias while answering questions posed by attorneys than by judges. Moreover, lawyers generally know more about the case than the judges do at the beginning of the case. They also have an incentive to identify juror tendencies that may not lead to dismissal for cause but may be of concern to the client; at the very least, they may disagree with the judge’s resolution of a for-cause challenge because of their differing roles, perspective and knowledge of the case. Finally, it can be argued that “(p)otential jurors would be less likely to make snap judgments about attorneys if they were able to have more meaningful interaction with them.” Mirabella at 31. For those and other reasons, there may be questions that the Court would not ask the venire or at side bar, but an attorney might still pose within proper limits in order to identify unconscious bias.[6]
There is no doubt that attorney-led voir dire has disadvantages as well, particularly the additional time required and the potential for creating rather than curing bias. The lack of attorney skill and experience (particularly in a state like Massachusetts where attorney voir dire is rare) might also result in poor performance by attorneys and create a negative impression of counsel rather a positive one. See Mirabella at 29-30. As contemplated by §28, “the direction of the Court” can and must address these and other problems.
The question of excessively long voir dire depends upon a number of factors, some of which will not be known until the day of trial. It is possible, for instance, that empanelment will take longer in this case because attorney-led voir dire may lead to more dismissals for cause. If so, that is time well spent. The need for an impartial juiy must take precedence over concerns about the time it takes to identify jurors who do not truly stand indifferent.
Other same-day impacts on efficiency could nevertheless dictate denial of the Motion. Sometimes there are enough jurors in the Middlesex County jury pool to accommodate simultaneously all sessions going to trial that day. However, that is not always so. If other sessions are waiting for the empanelment in this case to conclude so that the non-sitting jurors can be released, the additional time required for attorney-conducted voir dire may delay other civil and criminal trials in this county. That would not be acceptable. The Court will make a same-day judgment about whether the time required for attorney voir dire will have that effect.
Even without an impact on other sessions, the time of the jurors and the scheduling of subsequent trials in this session are important, as is the Court’s time, which might be spent on other matters. It is also questionable whether adding two hours to the voir dire process would even permit completion of empanelment before the lunch hour, raising the prospect of holding prospective jurors into the afternoon before they know whether they will have to serve or may go home. Depending upon the day of empanelment, going past 1 PM could also conflict with motions and other *323 matters scheduled for the afternoon, although that may not be a problem in this case where empanelment happens to fall on a day when motions are not scheduled. For those reasons, one hour of attorney-led voir dire per side is excessive.
On the other hand, the particular timing of trial in this case is fortuitous. It replaces two longer trials that settled recently, making it very unlikely that a longer empanelment in this case will interfere with the commencement of the next trial in this session (Middlesex Civil A). That will not always be the case, of course.
The juiy questionnaire will provide a substantial amount of useful information, thereby reducing the need for a full hour of attorney questioning per side. Eliminating individual court-directed voir dire of every juror will also save some time, although it is impossible to know how much. With one-half hour of attorney-led voir dire per side — and only two sides to this case, each with five peremptory challenges — there is a good chance that the process will take only a little longer than the Court’s usual practice of individual voir dire.[7]
Given the consequences of excessively long voir dire upon the prompt scheduling of trials, upon the jurors and upon scarce resources, the Court will limit attorney-led voir dire to a total of one half hour. Unless conditions on the day of trial dictate otherwise, the Court will allow one-half hour per side of attorney-led voir dire, starting with the initial 22 qualified jurors (14 jurors and 8 replacements). Counsel may reserve some of their half-hour for future use in the event that it is necessary to call more than the 22 jurors that the Court initially plans to qualify.
The attorney-led voir dire will occur subject to a number of conditions designed to identify bias, rather than create it. In particular, the attorneys must submit their proposed questions to the Court for approval before asking them of the jurors. This requirement reflects a need for caution in light of the relative lack of experience with attorney-led voir dire in Massachusetts, as well as the dangers that certain questions pose for the integrity of the process. The Court agrees completely with the defendant that the plaintiffs “radical and dangerous” proposal (in the proposed juror questionnaire) to ask questions about political parly affiliation and liberal-conservative philosophy is inappropriate. Partisan politics and political discussions of that sort have no place in the courtroom. The fact that this suggestion was made illustrates the need for pre-approval of attorney questions for jurors.
Asking the pre-approved questions will inevitably lead to the need to ask follow-up questions. The Court will allow counsel to do so, as long as the follow-up questioning is fairly within the scope of the juror’s answer to a question asked by either attorney. Permissible follow-up questioning also includes questions seeking explanation, elaboration or clarification of information provided by thejuror in the standard juror questionnaire or in the Supplemental Questionnaire. Permissible follow-up does not include questions that intrude upon the topics the Court has found to be out-of bounds. For sake of clarity, those topics are restated in Appendix C.
For instance, the Court will not allow questions designed to circumvent the rules on proper argument and pleading, such as appeals that jurors consider the impact of verdicts upon themselves individually, that they place themselves in the shoes of one party or the other, or that they should “send a message.” Cf. Sylva, 2002 WL 202467 at *3 (suggesting large dollar awards to the jury by implying a number or range of numbers may improperly tend to instill bias in jurors, as recognized by, for instance, the Legislature’s prohibition upon ad damnum clauses, G.L.c. 231, §13B). The question of insurance must also be approached carefully, although the availability of insurance for an auto accident is not likely to escape any juror’s notice. Compare Sylva, 2002 WE 202467 at *3 (concern about insurance questioning is more acute in medical malpractice cases than in auto cases). In general, questions having no substantial purpose beyond arguing an attorney’s case to the jury are also inappropriate.
Wu has submitted 13 questions with the Motion. If intended as questions to be posed by her attorneys, all of those questions appear legitimate and may be asked during attorney voir dire (unlike the political questions in the proposed questionnaire, which shall not be asked). Lauriat has not proposed any voir dire questions, either to be asked by the Court or attorneys, but may do so at the final trial conference.
ORDER
For the above reasons the Motion is conditionally allowed subject to same-day determination of the availability of jurors and time in this and other sessions and pursuant to the following conditions:
1. Plaintiffs counsel shall forthwith inform defendant’s counsel whether they wish to proceed with attorney-led voir dire, given the modifications the Court has made to the original proposal. If so, the parties shall comply with condition 2.a below.
2. At the final trial conference, the parties shall be prepared to do the following, in addition to the items previously ordered:
a. Provide a list of all questions that party proposes to ask during attorney-led voir dire.
b. Provide all and supplemental questions they wish to add to, and comments they may have regarding, the attached proposed Supplemental Juror Questionnaire (Exhibit A) or the attached Protocol for Attorney-Led Voir Dire (Exhibit B).
c. If any counsel wishes to have the completed Supplemental Jury Questionnaires copied for use of counsel during empanelment (as opposed to sharing the original), he shall propose a means
*324 for doing so without delaying proceedings. This likely means bring his own copier to Conference Room 701 outside the Court Room. Any copying shall result in providing copies to both sides.
d. Update the Court on the status of agreement upon Exhibits and jury notebook, if any; argue objections concerning disputed exhibits; argue motions in limine; provide an updated and final witness list with addresses; alert the Court to any particular witness with special scheduling limitations; and provide a realistic estimate and schedule for the trial, assuming full days on Monday, Wednesday and Friday and half days on Tuesday and Thursday.
EXHIBIT A
SUPPLEMENTAL JUROR QUESTIONNAIRE
We will be selecting fourteen (14) jurors for the trial. To aid us in this selection please answer the following questions while you wait for next step of the selection process. Your answers will help us ensure that each juror selected for the trial will fairly and impartially decide this case. Your answers will be kept confidential if your response to the last question (question 20) demonstrates to the Court’s satisfaction that the information is private or embarrassing and should not be disclosed.
Please Remember: When answering these questions. YOU ARE STILL UNDER OATH OR AFFIRMATION.
PLEASE DO NOT DISCUSS YOUR RESPONSES TO THIS QUESTIONNAIRE OR ANY ASPECT OF THIS CASE WITH OTHER JURORS
Q. 1. Your full name:_
Your juror number:_
Q.2. What is your date of birth?
A.2._
Q.3. Do you have any difficulty understanding English?
A.3. YES_NO_
Q.3. Do you have any hearing problems?
A.3. YES_NO_
Q.4. Please describe your duties in your current occupation and, if not working outside the home, in your most recent job.
A.4._
Q.5. Do you have any employment, education, training, or other experience (paid or volunteer) in any of the following areas? (Check Yes or No for each).
YES NO Medicine or health care Law enforcement or investigation journalism or media Attorney law office or the court system Investigation or evaluation of claims Engineering Fire Department or paramedic
If you answered “yes” to any of the above categories, please describe any experience (you do not have to repeat information that you included on the juror questionnaire that you submitted when you arrived *325 this morning).
Q. 6. Have you ever made a claim or filed a lawsuit against anyone, for any reason, including personal injuiy or any other reason at all (do not include divorce)?
A.6. YES__ NO_
If you answered “yes,” please describe any such lawsuit (you do not have to repeat information that you included on the juror questionnaire that you submitted when you arrived this morning)._
Q.7. Has anyone ever made a claim or filed a lawsuit against you, for any reason, including personal injuiy or any other reason at all (do not include divorce)?
A. 7. YES_NO_
If you answered “yes,” please describe any such lawsuit (you do not have to repeat information that you included on the juror questionnaire that you submitted when you arrived this morning)._
A.8. Have you ever had an occasion where you thought you could bring a lawsuit against another person for personal injuiy, but you chose not to do so? A.8. YES_NO_
If you answered “yes,” please explain._
Q.9. If you ever had serious bodily injuiy because of the negligence of another, would you sue?
A.9. YES_NO_IT DEPENDS/NO OPINION
Q. 10. Do you think that it is wrong for someone to sue because they had serious bodily injuiy and believed it was caused by the negligence of another?
A. 10. YES_NO_IT DEPENDS/NO OPIN-ION_
Q. 11. Do you support legislative proposals to place caps or limits on the amount of money juries can award?
A. 11. Yes, there should be caps_
No, there should not be caps_
It Depends /No Opinion_
Please explain:
Q. 12. How much do you agree or disagree with each of the following opinions? Circle a number between 1 and 7, where:
1 is “Disagree Strongly,”
4 is “No Opinion/It Depends"
7 is “Agree Strongly”
a. People are too ready to sue.
Disagree strongly 1 2 3 4 5 6 7 Agree Strongly
b. Lawsuits are costing us all too much money. Disagree strongly 1 2 3 4 5 6 7 Agree Strongly
c. There are too many lawsuits.
Disagree strongly 1 2 3 4 5 6 7 Agree Strongly
d. Juiy awards are too high.
Disagree strongly 1 2 3 4 5 6 7 Agree Strongly
Q.13. The law allows people to seek money for the following types of damages in a lawsuit. If there is evidence for it, would you be willing to award money for:
Disability?_Yes_No
Medical Expenses?_Yes_No
Mental Suffering?_Yes_No
Physical Pain and Suffering?_Yes_No
Q.14. Have you, a family member or a close personal friend ever suffered a permanent brain injury?
A.14. YES_NO_
If you answered “yes,” please explain:
Q.15. Do you hold any religious, moral, political or philosophical beliefs that cause you to have objections to serving on a jury?
A.15. YES_NO_
If you answered “yes,” please explain:
Q. 16. Do you hold any religious, moral, political or philosophical beliefs that would prevent you form awarding money damages in a lawsuit?
A.16. YES_NO_
If you answered “yes,” please explain:
Q. 17. Is there anything else about you (such as any other life experiences you’ve had) that you think the Court should know about in connection with you possibly being a juror in this case?
A. 17. YES_NO_
If you answered “yes,” please explain.
Q. 18. The judge will order you, during the time you are a juror, not to do any research of any kind about *326 this case or anything connected with it, whether in any book, dictionary, or encyclopedia, on the Internet (including Google, Yahoo, Twitter, Facebook, and anything like them), and anywhere else. Do you promise to obey this order?
A. 18. YES_NO_
Q.19. The judge will order you, during the time you are a juror, not to communicate (or answer any communications to you) with anybody at all about this case, or about anything connected it, in any way (orally, by telephone, cell phone, computer, Twitter, Facebook or by any other electronic means). Do you promise to obey this order?
A. 19. YES_NO_
Q.20. Do you believe that your answer(s) to any of the above questions would be embarrassing or damaging if disclosed publicly or that disclosure would infringe on your privacy?
A.20. YES_NO_
If “yes,” indicate which answers you want kept out of the public court file and why:
#s:

THANK YOU FOR YOUR COURTESY, YOUR COOPERATION AND YOUR SERVICE

APPENDIX B
PROTOCOL FOR ATTORNEY-LED VOIR DIRE
1. The Court asks the statutory questions of the entire venire.
2. The Court seats the first 14 panel members in the jury box, plus 8 replacement jurors in seats near the jury box, after individual questioning regarding any affirmative response to the statutory questions. Challenges for cause based upon the juror’s response to the standard juror questionnaire or answers given at side bar must be made at side bar.
3. At the time he or she is directed to the jury box, each panel member and replacement receives a juror questionnaire with instructions to fill it out while waiting.
4. The Court Officer collects the completed juror questionnaires from the 14 panel members. The 8 replacements receive instructions to complete filling out the questionnaire.
5. Plaintiff has up to one-half hour to conduct voir dire on the 22 panel members and replacements, using pre-approved questions and follow-up (as defined in the Memorandum). If any response suggests a possible challenge for bias, counsel shall ask the juror whether he or she can be fair.
6. Defendant has up to one-half hour to conduct voir dire on the 22 panel members and replacements, using pre-approved questions. If any response suggests a possible challenge for bias, counsel shall ask the juror whether he or she can be fair.
7. Both parties exercise any additional challenges for cause based upon the questionnaire and attorney-led voir dire.
8. Plaintiff exercises her peremptories.
9. Replacement jurors take the place of challenged panel members until plaintiff is content.
10. Defendant exercises her peremptories.
11. Replacement jurors take the place of challenged panel members until defendant is content. Then plaintiff challenges, followed by defendant, etc.
12. If it appears at any time that eight replacement jurors will not be enough to provide a trial jury of 14 members, the Court Officer distributes juror questionnaires to remaining members of the venire.
13. If replacement jurors run out before 14 trial jurors are seated and no longer subject to challenge, additional venire members are called and interviewed at side bar or in the box, as appropriate depending upon the progress of the empanelment, after discussion with counsel. During this process, attorneys may use any additional voir dire questioning time they may have reserved.
APPENDIX C
While the Court expects counsel to exercise judgment as officers of the Court, it has also specifically excluded the following areas of questioning from attorney-led voir dire, including “follow-up” questioning:
1. Any question not previously approved by the Court, with the exception of “follow-up” questions as discussed in the Memorandum. The areas described below are specifically excluded from the concept of “follow-up” questions.
2. Questions concerning political parties (including their platforms), candidates, voting patterns or preferences or any other aspect of electoral or partisan politics.
3. Questions designed to circumvent the rules on proper argument and pleading, such as appeals that jurors consider the impact of verdicts upon themselves individually, that they place themselves in the shoes of one party or the other, or that they should “send a message.”
4. Questions suggesting the size of damage awards to the jury by implying a number, order of magnitude or range of numbers.
5. Questions directly or indirectly raising the issue of insurance, unless it is clear that no bias will result from asking a particular question.
6. Questions having no substantial purpose other than arguing an attorney’s case.
7. Questions about the outcome in prior cases where the person has served as a juror, including the prior vote(s) of the juror or the verdict of the entire jury.
8. Any other question that is inconsistent with the purpose of attorney-led voir dire as envisioned in the Memorandum.

 Based upon meeting with the parties to date, the Court anticipates that each side will use at least several peremptories. Selecting at least 8 replacement jurors will probably be necessary no matter how voir dire proceeds.

 Last viewed on August 27, 2012 at: http://ssm.com/abstract=2005457 and at http:// www.socialaw.com/sibook/judgeyowigl 2/Mirabell a%20Derrick%20Final%20Paper%20Conect%20Version.pdf. Page references are to the version available on the Social Law Library network.

 Gregory E. Mize, Paula Hannaford-Agor & Nicole L. Waters, The State-of-the-States Survey of Jury Improvement Efforts; A Compendium Report, 27-28 (2007), available at http://www.ncsconline.org/D_Research/cjs/pctf/SOSCom pendiumFinalpdJ. See also Survey of Massachusetts Judges in Materials from Jury Voir Dire in Massachusetts: A Bench-Bar Forum, June 22, 2011 (Mass.Bar.Assn.).

 See Consultant report entitled: “Jury Selection Without Attorney-Conducted Voir Dire,” Theresa Zagnoli, 2001, Zagnoli McEvoy Foley Ltd.

 See http://massiawyersweekly.com/2010/06/14/odds-agains t-tort-plaintiffs-in-massachusetts/.

 The Court will ordinarily focus upon questions that shed light upon potential dismissal for cause. Attorneys may wish to elicit information to exercise peremptory challenges, by asking questions that the Court would not view as material to dismissal for cause. While the Court will ask some of the latter type of questions as well, doing so comes with an implication that the Court believes the answer has something to do its own evaluation of bias — a message that the Court may not wish to convey. When an attorney asks the question, however, jurors will understand that the question is designed to determine attitudes toward the attorney’s client, not necessarily whether the Court itself thinks the answer will show whether the juror can be fair.

 Some individual voir dire almost certainly will be required here (as in virtually every case) to follow up on affirmative answers to the statutory questions, but a number of jurors will probably not need to be seen at the bench before being directed to the jury box. Avoiding individual judge-conducted voir dire of those jurors will save some time.
For purposes of comparison, in this Court’s experience, judge-directed individual voir dire generally requires about one hour per twenty jurors. To add two hours of attorney-led voir dire (equivalent to the time needed to vow dire 40 jurors at side bar) to the time needed to question those who will be seen at side bar in this case probably would exceed the time it takes to do judge-conducted voir dire by as much as an hour to hour and a half.
The Court does note that the presence of only two parties here reduces the time problem, as compared to the four-plaintiff (20 peremptories) situation in Sylua.